**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT**

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2022 MAR 23  PM 1: 56

CLERK

BY _____
DEPUTY CLERK

THE CINCINNATI INSURANCE COMPANY
6200 South Gilmore Road
Fairfield, OH 45014

        Plaintiff,

    v.

WOLVERINE BRASS, INC.
2951 East Highway 501
Conway, SC 29526

and

PLUMBMASTER, INC.
51 Lacrue Avenue
Glen Mills, PA 19342

and

PROFESSIONAL PLUMBING GROUP, INC.
51 Lacrue Avenue
Glen Mills, PA 19342

and

F.W. WEBB COMPANY
160 Middlesex Turnpike
Bedford, MA 01730

and

FANSKI GROUP, INC.
No. 7 Shengyuan Road
Yucheng Street
Yuhuan City, Zhejiang Province, China 317600

and

FANSKI USA
7A Donna Drive
Wood-Ridge, NJ 07075

        Defendants.

CIVIL ACTION

CASE NO.:   5:22-cv-71

**JURY TRIAL DEMANDED**

## CIVIL ACTION COMPLAINT

Plaintiff, The Cincinnati Insurance Company, as subrogee of Theodore and Maureen Steckel, by way of Civil Action Complaint against Defendants, Wolverine Brass, Inc.; Plumbmaster, Inc.; Professional Plumbing Group, Inc.; F.W. Webb Company; Fanski Group, Inc.; and Fanski USA, alleges as follows:

## THE PARTIES

1.      Plaintiff, The Cincinnati Insurance Company ("Plaintiff"), as subrogee of Theodore and Maureen Steckel (the "Insureds"), is a corporation organized and existing under the laws of the State of Ohio, with its principal place of business located at 6200 South Gilmore Road, Fairfield, OH 45014.

2.      Defendant Wolverine Brass, Inc. ("Wolverine") is a corporation organized and existing under the laws of the State of Delaware with a principal place of business located at 2951 East Highway 501, Conway, SC 29526, and a registered agent, The Corporation Trust Company, located at 1209 Orange Street, Wilmington, DE 19801.

3.      Defendant Plumbmaster, Inc. ("Plumbmaster") is a corporation organized and existing under the laws of the State of Delaware with a principal place of business located at 51 Lacrue Avenue, Glen Mills, PA 19342, and a registered agent, The Corporation Trust Company, located at 1209 Orange Street, Wilmington, DE 19801.

4.      Defendant Professional Plumbing Group, Inc. ("PPG") is a corporation organized and existing under the laws of the State of Delaware with a principal place of business located at 51 Lacrue Avenue, Glen Mills, PA 19342, and a registered agent, The Corporation Trust Company, located at 1209 Orange Street, Wilmington, DE 19801.

5.      Defendant F.W. Webb Company ("F.W. Webb") is a corporation organized and existing under the laws of the Commonwealth of Massachusetts with a principal place of business located at 160 Middlesex Turnpike, Bedford, MA 01730.

6.      Defendant Fanski Group, Inc. ("Fanski Group") is a foreign corporation organized and existing under the laws of the Peoples Republic of China with a principal place of business located at No. 7, Shengyuan Road, Yucheng Street, Yuhuan City, Zhejiang Province, China 317600, and which regularly conducts business in the State of Vermont.

7.      Defendant Fanski USA ("Fanski USA") is a corporation organized and existing under the laws of the State of New Jersey with a principal place of business located at 7A Donna Drive, Wood-Ridge, NJ 07075.

## JURISDICTION AND VENUE

8.      Jurisdiction in this Court is based upon diversity of citizenship pursuant to 28 U.S.C. §1332(a)(1) as this action involves a controversy between citizens of different states and the amount in controversy exceeds the jurisdictional threshold of this Court (exclusive of interest and costs).

9.      Venue in this Court is proper pursuant to 28 U.S.C. §1391(a) because a substantial part of the events or omissions which gave rise to the Plaintiff's claims asserted herein occurred within the District of Vermont.

10.      At all times material hereto, Defendant Wolverine regularly conducted business in and maintained substantial and continuous contacts within the District of Vermont.

11.      At all times material hereto, Defendant Plumbmaster regularly conducted business in and maintained substantial and continuous contacts within the District of Vermont.

3

12.     At all times material hereto, Defendant PPG regularly conducted business in and maintained substantial and continuous contacts within the District of Vermont.

13.     At all times material hereto, Defendant F.W. Webb regularly conducted business in and maintained substantial and continuous contacts within the District of Vermont.

14.     At all times material hereto, Defendant Fanski Group regularly conducted business in and maintained substantial and continuous contacts within the District of Vermont.

15.     At all times material hereto, Defendant Fanski USA regularly conducted business in and maintained substantial and continuous contacts within the District of Vermont.

## BACKGROUND

16.     At all times material hereto, Plaintiff's Insureds were the owners and occupants of the residential property located at 598 Keniston Hill Road, Sheffield, VT 05866 (the "Premises").

17.     At all times material hereto, Plaintiff was duly authorized to issue policies of insurance in the State of Vermont.

18.     At all times material hereto, Plaintiff provided insurance coverage to its Insureds for the Premises and the contents therein pursuant to a policy of insurance (the "Policy").

19.     At all times material hereto, Defendant Wolverine was engaged in the business of, *inter alia*, designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce water supply lines and/or component parts for water supply lines which were intended for use by consumers for the ordinary purposes associated with such items.

20.     At all times material hereto, Defendant Wolverine knew and intended that its water supply lines and/or component parts for water supply lines would be used by members of the

general public and knew of the specific uses, purposes and requirements for which said products would be utilized.

21.     At all times material hereto, Defendant Plumbmaster was engaged in the business of, *inter alia*, designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce water supply lines and/or component parts for water supply lines which were intended for use by consumers for the ordinary purposes associated with such items.

22.     At all times material hereto, Defendant Plumbmaster knew and intended that its water supply lines and/or component parts for water supply lines would be used by members of the general public and knew of the specific uses, purposes and requirements for which said products would be utilized.

23.     At all times material hereto, Defendant PPG was engaged in the business of, *inter alia*, designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce water supply lines and/or component parts for water supply lines which were intended for use by consumers for the ordinary purposes associated with such items.

24.     At all times material hereto, Defendant PPG knew and intended that its water supply lines and/or component parts for water supply lines would be used by members of the general public and knew of the specific uses, purposes and requirements for which said products would be utilized.

25.     At all times material hereto, Defendant F.W. Webb was engaged in the business of, *inter alia*, designing, engineering, developing, manufacturing, assembling, testing, inspecting,

packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce water supply lines and/or component parts for water supply lines which were intended for use by consumers for the ordinary purposes associated with such items.

26.     At all times material hereto, Defendant F.W. Webb knew and intended that its water supply lines and/or component parts for water supply lines would be used by members of the general public and knew of the specific uses, purposes and requirements for which said products would be utilized.

27.     At all times material hereto, Defendant Fanski Group was engaged in the business of, *inter alia*, designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce water supply lines and/or component parts for water supply lines which were intended for use by consumers for the ordinary purposes associated with such items.

28.     At all times material hereto, Defendant Fanski Group knew and intended that its water supply lines and/or component parts for water supply lines would be used by members of the general public and knew of the specific uses, purposes and requirements for which said products would be utilized.

29.     At all times material hereto, Defendant Fanski USA was engaged in the business of, *inter alia*, designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce water supply lines and/or component parts for water supply lines which were intended for use by consumers for the ordinary purposes associated with such items.

30.     At all times material hereto, Defendant Fanski USA knew and intended that its water supply lines and/or component parts for water supply lines would be used by members of the general public and knew of the specific uses, purposes and requirements for which said products would be utilized.

31.     Prior to November 19, 2019, a water supply line Wolverine Brass part number 57573), including, but not limited to, its component parts (hereinafter, the "Product") was designed, engineered, developed, manufactured, assembled, tested, inspected, packaged, labeled, promoted, marketed, distributed, supplied, sold, and/or placed into the stream of commerce by Defendants, Wolverine, Plumbmaster, PPG, F.W. Webb, Fanski Group, and/or Fanski USA.

32.     At the time that the Product was placed into the stream of commerce by Defendants, Wolverine, Plumbmaster, PPG, F.W. Webb, Fanski Group, and/or Fanski USA, it was unreasonably and/or inherently dangerous, defective, and/or hazardous.

33.     Prior to November 19, 2019, the Product was purchased and installed in the Premises.

34.     The Product was in the same condition as the date it was installed in the Premises, and was not otherwise altered, modified, and/or changed in any way prior to or during its use.

35.     On or about November 19, 2019, a water loss (the "Water Loss") was caused to occur at the Premises due to the negligent and other liability producing conduct of Defendants, Wolverine, Plumbmaster, PPG, F.W. Webb, Fanski Group, and/or Fanski USA, individually, jointly, and/or severally.

36.     Specifically, the Water Loss was caused to occur because the Product was defective and failed to function as it was intended, which in turn caused water to discharge throughout the Premises.

37.     As a result of the Water Loss, Plaintiff's Insureds sustained substantial damage to the Premises and the contents therein.

38.     As a result of the Water Loss, and pursuant to the Policy issued to the Insureds by Plaintiff, Plaintiff made payments to, or on behalf of, its Insureds in an amount in excess of $296,696.90.

39.     By virtue of the payments made to, or on behalf of, its Insureds, and in accordance with the terms and conditions of the Policy, Plaintiff is now legally, equitably, and contractually subrogated to the rights of its Insureds as against Defendants, Wolverine, Plumbmaster, PPG, F.W. Webb, Fanski Group, and/or Fanski USA, individually, jointly, and/or severally, to the extent of said payments.

## COUNT I – NEGLIGENCE
### (Plaintiff v. Defendant Wolverine)

40.     Plaintiff hereby incorporates the previous paragraphs of this Complaint as if fully set forth herein at length.

41.     The Product was designed, engineered, developed, manufactured, assembled, tested, inspected, packaged, labeled, promoted, marketed, distributed, supplied, sold, and/or placed into the stream of commerce by Defendant Wolverine in the ordinary course of business.

42.     At the time that the Product was placed into the stream of commerce by Defendant Wolverine, it owed a duty to the public, including Plaintiff's Insureds, to ensure that said Product

was free of any dangerous, defective, and/or hazardous conditions that could cause reasonably foreseeable harm such as a water discharge.

43.     At all times material hereto, the Product was used in a reasonably anticipated and foreseeable manner.

44.     Defendant Wolverine, through the acts and omissions of its agents, servants, workmen, contractors and/or employees, breached its duties of care both generally and specifically as follows by:

a.      Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product;

b.      Failing to adequately, properly, and/or safely design, engineer, develop, manufacture, assemble, test, inspect, package, label, promote, market, distribute, supply, sell, and/or place into the stream of commerce the Product;

c.      Selling, distributing, supplying, and/or placing into the stream of commerce the Product in an unreasonably and/or inherently dangerous, defective, and/or hazardous condition;

d.      Selling, distributing, supplying, and/or placing into the stream of commerce the Product which malfunctioned and caused the Water Loss;

e.      Selling, distributing, supplying, and/or placing into the stream of commerce the Product which malfunctioned and/or failed to operate in the manner which such Product should under the circumstances;

f.      Failing to warn consumers of the substantial risk of Water Loss posed by the unreasonably and/or inherently dangerous, defective, and/or hazardous Product;

g.      Failing to provide consumers with adequate instructions, precautions, and/or warnings for the safe use of the Product;

h.      Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product without concern for and/or adherence to all local, state, and federal laws, statutes, ordinances, rules, regulations, and/or codes;

i.      Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product without concern for and/or adherence to all acceptable industry standards and codes;

j.      Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product when safer methods existed and/or were feasible;

k.      Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product that had a significant risk of stress corrosion cracking and/or

dezincification under the environmental conditions in which such products were reasonably expected to be placed; and/or

l.      Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product that was comprised of component parts and/or materials which were insufficient to prevent stress corrosion cracking and/or dezincification under the environmental conditions in which such products were reasonably expected to be placed.

45.      As a direct, proximate, and foreseeable result of the unreasonably and/or inherently dangerous, defective, and/or hazardous condition of the Product as aforesaid, and its subsequent failure, the Water Loss occurred causing substantial damages to the Premises and its contents therein.

46.      As a direct, proximate, and foreseeable result of the unreasonably and/or inherently dangerous, defective, and/or hazardous condition of the Product as aforesaid, and its subsequent failure, Plaintiff's Insureds sustained substantial losses.

47.      As a direct, proximate, and foreseeable result of the unreasonably and/or inherently dangerous, defective, and/or hazardous condition of the Product as aforesaid, and its subsequent failure, and pursuant to the insurance policy issued by Plaintiff, Plaintiff made payments to, or on behalf of, its Insureds in an amount in excess of $296,696.90.

48.      By virtue of the payments made to, or on behalf of, its Insureds, and in accordance with the terms and conditions of the Policy, Plaintiff is now legally, equitably, and contractually

subrogated to the rights of its Insureds as against Defendant Wolverine, individually, jointly, and/or severally, to the extent of said payments.

**WHEREFORE**, Plaintiff hereby demands judgment in its favor and against Defendant Wolverine, individually, jointly, and/or severally, in an amount in excess of $296,696.90, together with pre-judgment interest, post-judgment interest, and such other relief as this Honorable Court finds proper and just under the circumstances.

**COUNT II – STRICT LIABILITY**
**(Plaintiff v. Defendant Wolverine)**

49.     Plaintiff hereby incorporates the previous paragraphs of this Complaint as if fully set forth herein at length.

50.     The Product was designed, engineered, developed, manufactured, assembled, tested, inspected, packaged, labeled, promoted, marketed, distributed, supplied, sold, and/or placed into the stream of commerce by Defendant Wolverine in the ordinary course of business.

51.     At the time that the Product was placed into the stream of commerce by Defendant Wolverine, Defendant Wolverine knew and intended that such products would be used by members of the general public and knew of the specific uses, purposes and requirements for which said products would be utilized.

52.     The Product malfunctioned and/or failed to operate in the manner which such a product should under the circumstances.

53.     At the time that the Product was placed into the stream of commerce by Defendant Wolverine, it was in an unreasonably and/or inherently dangerous, defective, and/or hazardous condition.

54.     Defendant Wolverine knew, or should have known, that the Product was unreasonably and/or inherently dangerous, defective, and/or hazardous when used for its normal, intended use.

55.     As a direct, proximate, and foreseeable result of the unreasonably and/or inherently dangerous, defective, and/or hazardous condition of the Product as aforesaid, and its subsequent failure, the Water Loss occurred causing substantial damages to the Premises and its contents therein.

56.     As a direct, proximate, and foreseeable result of the unreasonably and/or inherently dangerous, defective, and/or hazardous condition of the Product as aforesaid, and its subsequent failure, Plaintiff's Insureds sustained substantial losses.

57.     As a direct, proximate, and foreseeable result of the unreasonably and/or inherently dangerous, defective, and/or hazardous condition of the Product as aforesaid, and its subsequent failure, and pursuant to the insurance policy issued by Plaintiff, Plaintiff made payments to, or on behalf of, its Insureds in an amount in excess of $296,696.90.

58.     By virtue of the payments made to, or on behalf of, its Insureds, and in accordance with the terms and conditions of the Policy, Plaintiff is now legally, equitably, and contractually subrogated to the rights of its Insureds as against Defendant Wolverine, individually, jointly, and/or severally, to the extent of said payments.

**WHEREFORE**, Plaintiff hereby demands judgment in its favor and against Defendant Wolverine, individually, jointly, and/or severally, in an amount in excess of $296,696.90, together with pre-judgment interest, post-judgment interest, and such other relief as this Honorable Court finds proper and just under the circumstances.

## COUNT III – BREACH OF IMPLIED WARRANTY
### (Plaintiff v. Defendant Wolverine)

59.     Plaintiff hereby incorporates the previous paragraphs of this Complaint as if fully set forth herein at length.

60.     In designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce the Product, Defendant Wolverine impliedly warranted that the Product was of good and merchantable quality and/or fit for its ordinary, intended, and/or foreseeable use and/or purpose.

61.     Defendant Wolverine, through the acts and omissions of its agents, servants, workmen, contractors and/or employees, breached the aforesaid implied warranties both generally and specifically as follows by:

        a.     Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product;

        b.     Failing to adequately, properly, and/or safely design, engineer, develop, manufacture, assemble, test, inspect, package, label, promote, market, distribute, supply, sell, and/or place into the stream of commerce the Product;

        c.     Selling, distributing, supplying, and/or placing into the stream of commerce the Product in an unreasonably and/or inherently dangerous, defective, and/or hazardous condition;

        d.     Selling, distributing, supplying, and/or placing into the stream of commerce the Product which malfunctioned and caused the Water Loss;

e.      Selling, distributing, supplying, and/or placing into the stream of commerce the Product which malfunctioned and/or failed to operate in the manner which such Product should under the circumstances;

f.      Failing to warn consumers of the substantial risk of Water Loss posed by the unreasonably and/or inherently dangerous, defective, and/or hazardous Product;

g.      Failing to provide consumers with adequate instructions, precautions, and/or warnings for the safe use of the Product;

h.      Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product without concern for and/or adherence to all local, state, and federal laws, statutes, ordinances, rules, regulations, and/or codes;

i.      Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product without concern for and/or adherence to all acceptable industry standards and codes;

j.      Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product when safer methods existed and/or were feasible;

k.      Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product that had a significant risk of stress corrosion cracking and/or dezincification under the environmental conditions in which such products were reasonably expected to be placed;

l.      Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product that was comprised of component parts and/or materials which were insufficient to prevent stress corrosion cracking and/or dezincification under the environmental conditions in which such products were reasonably expected to be placed;

m.      Otherwise selling, distributing, supplying, and/or placing into the stream of commerce a Product which was not of good and merchantable quality; and/or

n.      Otherwise selling, distributing, supplying, and/or placing into the stream of commerce a Product which was not fit for its ordinary, intended, and/or foreseeable use and/or purpose.

62.     As a direct, proximate, and foreseeable result of the breaches of Defendant Wolverine as aforesaid, the Water Loss occurred causing substantial damages to the Premises and its contents therein.

63.     As a direct, proximate, and foreseeable result of the breaches of Defendant Wolverine as aforesaid, Plaintiff's Insureds sustained substantial losses.

64.     As a direct, proximate, and foreseeable result of the breaches of Defendant Wolverine as aforesaid, and pursuant to the insurance policy issued by Plaintiff, Plaintiff made payments to, or on behalf of, its Insureds in an amount in excess of $296,696.90.

65.     By virtue of the payments made to, or on behalf of, its Insureds, and in accordance with the terms and conditions of the Policy, Plaintiff is now legally, equitably, and contractually subrogated to the rights of its Insureds as against Defendant Wolverine, individually, jointly, and/or severally, to the extent of said payments.

**WHEREFORE**, Plaintiff hereby demands judgment in its favor and against Defendant Wolverine, individually, jointly, and/or severally, in an amount in excess of $296,696.90, together with pre-judgment interest, post-judgment interest, and such other relief as this Honorable Court finds proper and just under the circumstances.

**COUNT IV – NEGLIGENCE**
**(Plaintiff v. Defendant Plumbmaster)**

66.     Plaintiff hereby incorporates the previous paragraphs of this Complaint as if fully set forth herein at length.

67.     The Product was designed, engineered, developed, manufactured, assembled, tested, inspected, packaged, labeled, promoted, marketed, distributed, supplied, sold, and/or placed into the stream of commerce by Defendant Plumbmaster in the ordinary course of business.

68.     At the time that the Product was placed into the stream of commerce by Defendant Plumbmaster, it owed a duty to the public, including Plaintiff's Insureds, to ensure that said Product was free of any dangerous, defective, and/or hazardous conditions that could cause reasonably foreseeable harm such as a water discharge.

69.     At all times material hereto, the Product was used in a reasonably anticipated and foreseeable manner.

70.     Defendant Plumbmaster, through the acts and omissions of its agents, servants, workmen, contractors and/or employees, breached its duties of care both generally and specifically as follows by:

        a.      Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product;

        b.      Failing to adequately, properly, and/or safely design, engineer, develop, manufacture, assemble, test, inspect, package, label, promote, market, distribute, supply, sell, and/or place into the stream of commerce the Product;

        c.      Selling, distributing, supplying, and/or placing into the stream of commerce the Product in an unreasonably and/or inherently dangerous, defective, and/or hazardous condition;

        d.      Selling, distributing, supplying, and/or placing into the stream of commerce the Product which malfunctioned and caused the Water Loss;

        e.      Selling, distributing, supplying, and/or placing into the stream of commerce the Product which malfunctioned and/or failed to operate in the manner which such Product should under the circumstances;

        f.      Failing to warn consumers of the substantial risk of Water Loss posed by the unreasonably and/or inherently dangerous, defective, and/or hazardous Product;

g.      Failing to provide consumers with adequate instructions, precautions, and/or warnings for the safe use of the Product;

h.      Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product without concern for and/or adherence to all local, state, and federal laws, statutes, ordinances, rules, regulations, and/or codes;

i.      Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product without concern for and/or adherence to all acceptable industry standards and codes;

j.      Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product when safer methods existed and/or were feasible;

k.      Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product that had a significant risk of stress corrosion cracking and/or dezincification under the environmental conditions in which such products were reasonably expected to be placed; and/or

l.      Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product that was comprised of component parts and/or materials which were insufficient to prevent stress corrosion cracking and/or dezincification under the environmental conditions in which such products were reasonably expected to be placed.

71.     As a direct, proximate, and foreseeable result of the unreasonably and/or inherently dangerous, defective, and/or hazardous condition of the Product as aforesaid, and its subsequent failure, the Water Loss occurred causing substantial damages to the Premises and its contents therein.

72.     As a direct, proximate, and foreseeable result of the unreasonably and/or inherently dangerous, defective, and/or hazardous condition of the Product as aforesaid, and its subsequent failure, Plaintiff's Insureds sustained substantial losses.

73.     As a direct, proximate, and foreseeable result of the unreasonably and/or inherently dangerous, defective, and/or hazardous condition of the Product as aforesaid, and its subsequent failure, and pursuant to the insurance policy issued by Plaintiff, Plaintiff made payments to, or on behalf of, its Insureds in an amount in excess of $296,696.90.

74.     By virtue of the payments made to, or on behalf of, its Insureds, and in accordance with the terms and conditions of the Policy, Plaintiff is now legally, equitably, and contractually subrogated to the rights of its Insureds as against Defendant Plumbmaster, individually, jointly, and/or severally, to the extent of said payments.

**WHEREFORE**, Plaintiff hereby demands judgment in its favor and against Defendant Plumbmaster, individually, jointly, and/or severally, in an amount in excess of $296,696.90, together with pre-judgment interest, post-judgment interest, and such other relief as this Honorable Court finds proper and just under the circumstances.

## COUNT V – STRICT LIABILITY
### (Plaintiff v. Defendant Plumbmaster)

75.     Plaintiff hereby incorporates the previous paragraphs of this Complaint as if fully set forth herein at length.

76.     The Product was designed, engineered, developed, manufactured, assembled, tested, inspected, packaged, labeled, promoted, marketed, distributed, supplied, sold, and/or placed into the stream of commerce by Defendant Plumbmaster in the ordinary course of business.

77.     At the time that the Product was placed into the stream of commerce by Defendant Plumbmaster, Defendant Plumbmaster knew and intended that such products would be used by members of the general public and knew of the specific uses, purposes and requirements for which said products would be utilized.

78.     The Product malfunctioned and/or failed to operate in the manner which such a product should under the circumstances.

79.     At the time that the Product was placed into the stream of commerce by Defendant Plumbmaster, it was in an unreasonably and/or inherently dangerous, defective, and/or hazardous condition.

80.     Defendant Plumbmaster knew, or should have known, that the Product was unreasonably and/or inherently dangerous, defective, and/or hazardous when used for its normal, intended use.

21

81.     As a direct, proximate, and foreseeable result of the unreasonably and/or inherently dangerous, defective, and/or hazardous condition of the Product as aforesaid, and its subsequent failure, the Water Loss occurred causing substantial damages to the Premises and its contents therein.

82.     As a direct, proximate, and foreseeable result of the unreasonably and/or inherently dangerous, defective, and/or hazardous condition of the Product as aforesaid, and its subsequent failure, Plaintiff's Insureds sustained substantial losses.

83.     As a direct, proximate, and foreseeable result of the unreasonably and/or inherently dangerous, defective, and/or hazardous condition of the Product as aforesaid, and its subsequent failure, and pursuant to the insurance policy issued by Plaintiff, Plaintiff made payments to, or on behalf of, its Insureds in an amount in excess of $296,696.90.

84.     By virtue of the payments made to, or on behalf of, its Insureds, and in accordance with the terms and conditions of the Policy, Plaintiff is now legally, equitably, and contractually subrogated to the rights of its Insureds as against Defendant Plumbmaster, individually, jointly, and/or severally, to the extent of said payments.

**WHEREFORE,** Plaintiff hereby demands judgment in its favor and against Defendant Plumbmaster, individually, jointly, and/or severally, in an amount in excess of $296,696.90, together with pre-judgment interest, post-judgment interest, and such other relief as this Honorable Court finds proper and just under the circumstances.

## COUNT VI – BREACH OF IMPLIED WARRANTY
### (Plaintiff v. Defendant Plumbmaster)

85.     Plaintiff hereby incorporates the previous paragraphs of this Complaint as if fully set forth herein at length.

86.     In designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce the Product, Defendant Plumbmaster impliedly warranted that the Product was of good and merchantable quality and/or fit for its ordinary, intended, and/or foreseeable use and/or purpose.

87.     Defendant Plumbmaster, through the acts and omissions of its agents, servants, workmen, contractors and/or employees, breached the aforesaid implied warranties both generally and specifically as follows by:

      a.     Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product;

      b.     Failing to adequately, properly, and/or safely design, engineer, develop, manufacture, assemble, test, inspect, package, label, promote, market, distribute, supply, sell, and/or place into the stream of commerce the Product;

      c.     Selling, distributing, supplying, and/or placing into the stream of commerce the Product in an unreasonably and/or inherently dangerous, defective, and/or hazardous condition;

      d.     Selling, distributing, supplying, and/or placing into the stream of commerce the Product which malfunctioned and caused the Water Loss;

      e.     Selling, distributing, supplying, and/or placing into the stream of commerce the Product which malfunctioned and/or failed to operate in the manner which such Product should under the circumstances;

   f.  Failing to warn consumers of the substantial risk of Water Loss posed by the unreasonably and/or inherently dangerous, defective, and/or hazardous Product;

   g.  Failing to provide consumers with adequate instructions, precautions, and/or warnings for the safe use of the Product;

   h.  Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product without concern for and/or adherence to all local, state, and federal laws, statutes, ordinances, rules, regulations, and/or codes;

   i.  Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product without concern for and/or adherence to all acceptable industry standards and codes;

   j.  Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product when safer methods existed and/or were feasible;

   k.  Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product that had a significant risk of stress corrosion cracking and/or

dezincification under the environmental conditions in which such products were reasonably expected to be placed;

l.      Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product that was comprised of component parts and/or materials which were insufficient to prevent stress corrosion cracking and/or dezincification under the environmental conditions in which such products were reasonably expected to be placed;

m.      Otherwise selling, distributing, supplying, and/or placing into the stream of commerce a Product which was not of good and merchantable quality; and/or

n.      Otherwise selling, distributing, supplying, and/or placing into the stream of commerce a Product which was not fit for its ordinary, intended, and/or foreseeable use and/or purpose.

88.      As a direct, proximate, and foreseeable result of the breaches of Defendant Plumbmaster as aforesaid, the Water Loss occurred causing substantial damages to the Premises and its contents therein.

89.      As a direct, proximate, and foreseeable result of the breaches of Defendant Plumbmaster as aforesaid, Plaintiff's Insureds sustained substantial losses.

90.      As a direct, proximate, and foreseeable result of the breaches of Defendant Plumbmaster as aforesaid, and pursuant to the insurance policy issued by Plaintiff, Plaintiff made payments to, or on behalf of, its Insureds in an amount in excess of $296,696.90.

91.     By virtue of the payments made to, or on behalf of, its Insureds, and in accordance with the terms and conditions of the Policy, Plaintiff is now legally, equitably, and contractually subrogated to the rights of its Insureds as against Defendant Plumbmaster, individually, jointly, and/or severally, to the extent of said payments.

**WHEREFORE,** Plaintiff hereby demands judgment in its favor and against Defendant Plumbmaster, individually, jointly, and/or severally, in an amount in excess of $296,696.90, together with pre-judgment interest, post-judgment interest, and such other relief as this Honorable Court finds proper and just under the circumstances.

## COUNT VII – NEGLIGENCE
### (Plaintiff v. Defendant PPG)

92.     Plaintiff hereby incorporates the previous paragraphs of this Complaint as if fully set forth herein at length.

93.     The Product was designed, engineered, developed, manufactured, assembled, tested, inspected, packaged, labeled, promoted, marketed, distributed, supplied, sold, and/or placed into the stream of commerce by Defendant PPG in the ordinary course of business.

94.     At the time that the Product was placed into the stream of commerce by Defendant PPG, it owed a duty to the public, including Plaintiff's Insureds, to ensure that said Product was free of any dangerous, defective, and/or hazardous conditions that could cause reasonably foreseeable harm such as a water discharge.

95.     At all times material hereto, the Product was used in a reasonably anticipated and foreseeable manner.

96.     Defendant PPG, through the acts and omissions of its agents, servants, workmen, contractors and/or employees, breached its duties of care both generally and specifically as follows by:

a.      Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product;

b.      Failing to adequately, properly, and/or safely design, engineer, develop, manufacture, assemble, test, inspect, package, label, promote, market, distribute, supply, sell, and/or place into the stream of commerce the Product;

c.      Selling, distributing, supplying, and/or placing into the stream of commerce the Product in an unreasonably and/or inherently dangerous, defective, and/or hazardous condition;

d.      Selling, distributing, supplying, and/or placing into the stream of commerce the Product which malfunctioned and caused the Water Loss;

e.      Selling, distributing, supplying, and/or placing into the stream of commerce the Product which malfunctioned and/or failed to operate in the manner which such Product should under the circumstances;

f.      Failing to warn consumers of the substantial risk of Water Loss posed by the unreasonably and/or inherently dangerous, defective, and/or hazardous Product;

g.      Failing to provide consumers with adequate instructions, precautions, and/or warnings for the safe use of the Product;

h.      Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product without concern for and/or adherence to all local, state, and federal laws, statutes, ordinances, rules, regulations, and/or codes;

i.      Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product without concern for and/or adherence to all acceptable industry standards and codes;

j.      Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product when safer methods existed and/or were feasible;

k.      Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product that had a significant risk of stress corrosion cracking and/or dezincification under the environmental conditions in which such products were reasonably expected to be placed; and/or

l.      Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective,

and/or hazardous Product that was comprised of component parts and/or materials which were insufficient to prevent stress corrosion cracking and/or dezincification under the environmental conditions in which such products were reasonably expected to be placed.

97.     As a direct, proximate, and foreseeable result of the unreasonably and/or inherently dangerous, defective, and/or hazardous condition of the Product as aforesaid, and its subsequent failure, the Water Loss occurred causing substantial damages to the Premises and its contents therein.

98.     As a direct, proximate, and foreseeable result of the unreasonably and/or inherently dangerous, defective, and/or hazardous condition of the Product as aforesaid, and its subsequent failure, Plaintiff's Insureds sustained substantial losses.

99.     As a direct, proximate, and foreseeable result of the unreasonably and/or inherently dangerous, defective, and/or hazardous condition of the Product as aforesaid, and its subsequent failure, and pursuant to the insurance policy issued by Plaintiff, Plaintiff made payments to, or on behalf of, its Insureds in an amount in excess of $296,696.90.

100.    By virtue of the payments made to, or on behalf of, its Insureds, and in accordance with the terms and conditions of the Policy, Plaintiff is now legally, equitably, and contractually subrogated to the rights of its Insureds as against Defendant PPG, individually, jointly, and/or severally, to the extent of said payments.

**WHEREFORE**, Plaintiff hereby demands judgment in its favor and against Defendant PPG, individually, jointly, and/or severally, in an amount in excess of $296,696.90, together with pre-judgment interest, post-judgment interest, and such other relief as this Honorable Court finds proper and just under the circumstances.

## COUNT VIII – STRICT LIABILITY
### (Plaintiff v. Defendant PPG)

101.   Plaintiff hereby incorporates the previous paragraphs of this Complaint as if fully set forth herein at length.

102.   The Product was designed, engineered, developed, manufactured, assembled, tested, inspected, packaged, labeled, promoted, marketed, distributed, supplied, sold, and/or placed into the stream of commerce by Defendant PPG in the ordinary course of business.

103.   At the time that the Product was placed into the stream of commerce by Defendant PPG, Defendant PPG knew and intended that such products would be used by members of the general public and knew of the specific uses, purposes and requirements for which said products would be utilized.

104.   The Product malfunctioned and/or failed to operate in the manner which such a product should under the circumstances.

105.   At the time that the Product was placed into the stream of commerce by Defendant PPG, it was in an unreasonably and/or inherently dangerous, defective, and/or hazardous condition.

106.   Defendant PPG knew, or should have known, that the Product was unreasonably and/or inherently dangerous, defective, and/or hazardous when used for its normal, intended use.

107.   As a direct, proximate, and foreseeable result of the unreasonably and/or inherently dangerous, defective, and/or hazardous condition of the Product as aforesaid, and its subsequent failure, the Water Loss occurred causing substantial damages to the Premises and its contents therein.

108.   As a direct, proximate, and foreseeable result of the unreasonably and/or inherently dangerous, defective, and/or hazardous condition of the Product as aforesaid, and its subsequent failure, Plaintiff's Insureds sustained substantial losses.

109.   As a direct, proximate, and foreseeable result of the unreasonably and/or inherently dangerous, defective, and/or hazardous condition of the Product as aforesaid, and its subsequent failure, and pursuant to the insurance policy issued by Plaintiff, Plaintiff made payments to, or on behalf of, its Insureds in an amount in excess of $296,696.90.

110.   By virtue of the payments made to, or on behalf of, its Insureds, and in accordance with the terms and conditions of the Policy, Plaintiff is now legally, equitably, and contractually subrogated to the rights of its Insureds as against Defendant PPG, individually, jointly, and/or severally, to the extent of said payments.

**WHEREFORE**, Plaintiff hereby demands judgment in its favor and against Defendant PPG, individually, jointly, and/or severally, in an amount in excess of $296,696.90, together with pre-judgment interest, post-judgment interest, and such other relief as this Honorable Court finds proper and just under the circumstances.

## COUNT IX – BREACH OF IMPLIED WARRANTY
### (Plaintiff v. Defendant PPG)

111.   Plaintiff hereby incorporates the previous paragraphs of this Complaint as if fully set forth herein at length.

112.   In designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce the Product, Defendant PPG impliedly warranted that the

Product was of good and merchantable quality and/or fit for its ordinary, intended, and/or foreseeable use and/or purpose.

113.    Defendant PPG, through the acts and omissions of its agents, servants, workmen, contractors and/or employees, breached the aforesaid implied warranties both generally and specifically as follows by:

    a.    Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product;

    b.    Failing to adequately, properly, and/or safely design, engineer, develop, manufacture, assemble, test, inspect, package, label, promote, market, distribute, supply, sell, and/or place into the stream of commerce the Product;

    c.    Selling, distributing, supplying, and/or placing into the stream of commerce the Product in an unreasonably and/or inherently dangerous, defective, and/or hazardous condition;

    d.    Selling, distributing, supplying, and/or placing into the stream of commerce the Product which malfunctioned and caused the Water Loss;

    e.    Selling, distributing, supplying, and/or placing into the stream of commerce the Product which malfunctioned and/or failed to operate in the manner which such Product should under the circumstances;

    f.    Failing to warn consumers of the substantial risk of Water Loss posed by the unreasonably and/or inherently dangerous, defective, and/or hazardous Product;

g. Failing to provide consumers with adequate instructions, precautions, and/or warnings for the safe use of the Product;

h. Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product without concern for and/or adherence to all local, state, and federal laws, statutes, ordinances, rules, regulations, and/or codes;

i. Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product without concern for and/or adherence to all acceptable industry standards and codes;

j. Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product when safer methods existed and/or were feasible;

k. Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product that had a significant risk of stress corrosion cracking and/or dezincification under the environmental conditions in which such products were reasonably expected to be placed;

l.     Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product that was comprised of component parts and/or materials which were insufficient to prevent stress corrosion cracking and/or dezincification under the environmental conditions in which such products were reasonably expected to be placed;

m.     Otherwise selling, distributing, supplying, and/or placing into the stream of commerce a Product which was not of good and merchantable quality; and/or

n.     Otherwise selling, distributing, supplying, and/or placing into the stream of commerce a Product which was not fit for its ordinary, intended, and/or foreseeable use and/or purpose.

114.    As a direct, proximate, and foreseeable result of the breaches of Defendant PPG as aforesaid, the Water Loss occurred causing substantial damages to the Premises and its contents therein.

115.    As a direct, proximate, and foreseeable result of the breaches of Defendant PPG as aforesaid, Plaintiff's Insureds sustained substantial losses.

116.    As a direct, proximate, and foreseeable result of the breaches of Defendant PPG as aforesaid, and pursuant to the insurance policy issued by Plaintiff, Plaintiff made payments to, or on behalf of, its Insureds in an amount in excess of $296,696.90.

117.    By virtue of the payments made to, or on behalf of, its Insureds, and in accordance with the terms and conditions of the Policy, Plaintiff is now legally, equitably, and contractually

subrogated to the rights of its Insureds as against Defendant PPG, individually, jointly, and/or severally, to the extent of said payments.

**WHEREFORE**, Plaintiff hereby demands judgment in its favor and against Defendant PPG, individually, jointly, and/or severally, in an amount in excess of $296,696.90, together with pre-judgment interest, post-judgment interest, and such other relief as this Honorable Court finds proper and just under the circumstances.

## COUNT X – NEGLIGENCE
### (Plaintiff v. Defendant F.W. Webb)

118.    Plaintiff hereby incorporates the previous paragraphs of this Complaint as if fully set forth herein at length.

119.    The Product was designed, engineered, developed, manufactured, assembled, tested, inspected, packaged, labeled, promoted, marketed, distributed, supplied, sold, and/or placed into the stream of commerce by Defendant F.W. Webb in the ordinary course of business.

120.    At the time that the Product was placed into the stream of commerce by Defendant F.W. Webb, it owed a duty to the public, including Plaintiff's Insureds, to ensure that said Product was free of any dangerous, defective, and/or hazardous conditions that could cause reasonably foreseeable harm such as a water discharge.

121.    At all times material hereto, the Product was used in a reasonably anticipated and foreseeable manner.

122.    Defendant F.W. Webb, through the acts and omissions of its agents, servants, workmen, contractors and/or employees, breached its duties of care both generally and specifically as follows by:

a.      Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product;

b.      Failing to adequately, properly, and/or safely design, engineer, develop, manufacture, assemble, test, inspect, package, label, promote, market, distribute, supply, sell, and/or place into the stream of commerce the Product;

c.      Selling, distributing, supplying, and/or placing into the stream of commerce the Product in an unreasonably and/or inherently dangerous, defective, and/or hazardous condition;

d.      Selling, distributing, supplying, and/or placing into the stream of commerce the Product which malfunctioned and caused the Water Loss;

e.      Selling, distributing, supplying, and/or placing into the stream of commerce the Product which malfunctioned and/or failed to operate in the manner which such Product should under the circumstances;

f.      Failing to warn consumers of the substantial risk of Water Loss posed by the unreasonably and/or inherently dangerous, defective, and/or hazardous Product;

g.      Failing to provide consumers with adequate instructions, precautions, and/or warnings for the safe use of the Product;

h.      Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective,

and/or hazardous Product without concern for and/or adherence to all local, state, and federal laws, statutes, ordinances, rules, regulations, and/or codes;

i.      Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product without concern for and/or adherence to all acceptable industry standards and codes;

j.      Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product when safer methods existed and/or were feasible;

k.      Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product that had a significant risk of stress corrosion cracking and/or dezincification under the environmental conditions in which such products were reasonably expected to be placed; and/or

l.      Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product that was comprised of component parts and/or materials which were insufficient to prevent stress corrosion cracking and/or dezincification under the environmental conditions in which such products were reasonably expected to be placed.

123.    As a direct, proximate, and foreseeable result of the unreasonably and/or inherently dangerous, defective, and/or hazardous condition of the Product as aforesaid, and its subsequent failure, the Water Loss occurred causing substantial damages to the Premises and its contents therein.

124.    As a direct, proximate, and foreseeable result of the unreasonably and/or inherently dangerous, defective, and/or hazardous condition of the Product as aforesaid, and its subsequent failure, Plaintiff's Insureds sustained substantial losses.

125.    As a direct, proximate, and foreseeable result of the unreasonably and/or inherently dangerous, defective, and/or hazardous condition of the Product as aforesaid, and its subsequent failure, and pursuant to the insurance policy issued by Plaintiff, Plaintiff made payments to, or on behalf of, its Insureds in an amount in excess of $296,696.90.

126.    By virtue of the payments made to, or on behalf of, its Insureds, and in accordance with the terms and conditions of the Policy, Plaintiff is now legally, equitably, and contractually subrogated to the rights of its Insureds as against Defendant F.W. Webb, individually, jointly, and/or severally, to the extent of said payments.

**WHEREFORE**, Plaintiff hereby demands judgment in its favor and against Defendant F.W. Webb, individually, jointly, and/or severally, in an amount in excess of $296,696.90, together with pre-judgment interest, post-judgment interest, and such other relief as this Honorable Court finds proper and just under the circumstances.

## COUNT XI – STRICT LIABILITY
### (Plaintiff v. Defendant F.W. Webb)

127.    Plaintiff hereby incorporates the previous paragraphs of this Complaint as if fully set forth herein at length.

128.    The Product was designed, engineered, developed, manufactured, assembled, tested, inspected, packaged, labeled, promoted, marketed, distributed, supplied, sold, and/or placed into the stream of commerce by Defendant F.W. Webb in the ordinary course of business.

129.    At the time that the Product was placed into the stream of commerce by Defendant F.W. Webb, Defendant F.W. Webb knew and intended that such products would be used by members of the general public and knew of the specific uses, purposes and requirements for which said products would be utilized.

130.    The Product malfunctioned and/or failed to operate in the manner which such a product should under the circumstances.

131.    At the time that the Product was placed into the stream of commerce by Defendant F.W. Webb, it was in an unreasonably and/or inherently dangerous, defective, and/or hazardous condition.

132.    Defendant F.W. Webb knew, or should have known, that the Product was unreasonably and/or inherently dangerous, defective, and/or hazardous when used for its normal, intended use.

133.    As a direct, proximate, and foreseeable result of the unreasonably and/or inherently dangerous, defective, and/or hazardous condition of the Product as aforesaid, and its subsequent failure, the Water Loss occurred causing substantial damages to the Premises and its contents therein.

134.    As a direct, proximate, and foreseeable result of the unreasonably and/or inherently dangerous, defective, and/or hazardous condition of the Product as aforesaid, and its subsequent failure, Plaintiff's Insureds sustained substantial losses.

135.    As a direct, proximate, and foreseeable result of the unreasonably and/or inherently dangerous, defective, and/or hazardous condition of the Product as aforesaid, and its subsequent failure, and pursuant to the insurance policy issued by Plaintiff, Plaintiff made payments to, or on behalf of, its Insureds in an amount in excess of $296,696.90.

136.    By virtue of the payments made to, or on behalf of, its Insureds, and in accordance with the terms and conditions of the Policy, Plaintiff is now legally, equitably, and contractually subrogated to the rights of its Insureds as against Defendant F.W. Webb, individually, jointly, and/or severally, to the extent of said payments.

**WHEREFORE**, Plaintiff hereby demands judgment in its favor and against Defendant F.W. Webb, individually, jointly, and/or severally, in an amount in excess of $296,696.90, together with pre-judgment interest, post-judgment interest, and such other relief as this Honorable Court finds proper and just under the circumstances.

### COUNT XII – BREACH OF IMPLIED WARRANTY
**(Plaintiff v. Defendant F.W. Webb)**

137.    Plaintiff hereby incorporates the previous paragraphs of this Complaint as if fully set forth herein at length.

138.    In designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce the Product, Defendant F.W. Webb impliedly warranted that the Product was of good and merchantable quality and/or fit for its ordinary, intended, and/or foreseeable use and/or purpose.

139.    Defendant F.W. Webb, through the acts and omissions of its agents, servants, workmen, contractors and/or employees, breached the aforesaid implied warranties both generally and specifically as follows by:

a.    Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product;

b.    Failing to adequately, properly, and/or safely design, engineer, develop, manufacture, assemble, test, inspect, package, label, promote, market, distribute, supply, sell, and/or place into the stream of commerce the Product;

c.    Selling, distributing, supplying, and/or placing into the stream of commerce the Product in an unreasonably and/or inherently dangerous, defective, and/or hazardous condition;

d.    Selling, distributing, supplying, and/or placing into the stream of commerce the Product which malfunctioned and caused the Water Loss;

e.    Selling, distributing, supplying, and/or placing into the stream of commerce the Product which malfunctioned and/or failed to operate in the manner which such Product should under the circumstances;

f.    Failing to warn consumers of the substantial risk of Water Loss posed by the unreasonably and/or inherently dangerous, defective, and/or hazardous Product;

g.    Failing to provide consumers with adequate instructions, precautions, and/or warnings for the safe use of the Product;

41

h.     Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product without concern for and/or adherence to all local, state, and federal laws, statutes, ordinances, rules, regulations, and/or codes;

i.     Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product without concern for and/or adherence to all acceptable industry standards and codes;

j.     Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product when safer methods existed and/or were feasible;

k.     Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product that had a significant risk of stress corrosion cracking and/or dezincification under the environmental conditions in which such products were reasonably expected to be placed;

l.     Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective,

and/or hazardous Product that was comprised of component parts and/or materials which were insufficient to prevent stress corrosion cracking and/or dezincification under the environmental conditions in which such products were reasonably expected to be placed;

m.      Otherwise selling, distributing, supplying, and/or placing into the stream of commerce a Product which was not of good and merchantable quality; and/or

n.      Otherwise selling, distributing, supplying, and/or placing into the stream of commerce a Product which was not fit for its ordinary, intended, and/or foreseeable use and/or purpose.

140.   As a direct, proximate, and foreseeable result of the breaches of Defendant F.W. Webb as aforesaid, the Water Loss occurred causing substantial damages to the Premises and its contents therein.

141.   As a direct, proximate, and foreseeable result of the breaches of Defendant F.W. Webb as aforesaid, Plaintiff's Insureds sustained substantial losses.

142.   As a direct, proximate, and foreseeable result of the breaches of Defendant F.W. Webb as aforesaid, and pursuant to the insurance policy issued by Plaintiff, Plaintiff made payments to, or on behalf of, its Insureds in an amount in excess of $296,696.90.

143.   By virtue of the payments made to, or on behalf of, its Insureds, and in accordance with the terms and conditions of the Policy, Plaintiff is now legally, equitably, and contractually subrogated to the rights of its Insureds as against Defendant F.W. Webb, individually, jointly, and/or severally, to the extent of said payments.

**WHEREFORE**, Plaintiff hereby demands judgment in its favor and against Defendant F.W. Webb, individually, jointly, and/or severally, in an amount in excess of $296,696.90, together

with pre-judgment interest, post-judgment interest, and such other relief as this Honorable Court finds proper and just under the circumstances.

## COUNT XIII – NEGLIGENCE
### (Plaintiff v. Defendant Fanski Group)

144.     Plaintiff hereby incorporates the previous paragraphs of this Complaint as if fully set forth herein at length.

145.     The Product was designed, engineered, developed, manufactured, assembled, tested, inspected, packaged, labeled, promoted, marketed, distributed, supplied, sold, and/or placed into the stream of commerce by Defendant Fanski Group in the ordinary course of business.

146.     At the time that the Product was placed into the stream of commerce by Defendant Fanski Group, it owed a duty to the public, including Plaintiff's Insureds, to ensure that said Product was free of any dangerous, defective, and/or hazardous conditions that could cause reasonably foreseeable harm such as a water discharge.

147.     At all times material hereto, the Product was used in a reasonably anticipated and foreseeable manner.

148.     Defendant Fanski Group, through the acts and omissions of its agents, servants, workmen, contractors and/or employees, breached its duties of care both generally and specifically as follows by:

      a.     Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product;

b.      Failing to adequately, properly, and/or safely design, engineer, develop, manufacture, assemble, test, inspect, package, label, promote, market, distribute, supply, sell, and/or place into the stream of commerce the Product;

c.      Selling, distributing, supplying, and/or placing into the stream of commerce the Product in an unreasonably and/or inherently dangerous, defective, and/or hazardous condition;

d.      Selling, distributing, supplying, and/or placing into the stream of commerce the Product which malfunctioned and caused the Water Loss;

e.      Selling, distributing, supplying, and/or placing into the stream of commerce the Product which malfunctioned and/or failed to operate in the manner which such Product should under the circumstances;

f.      Failing to warn consumers of the substantial risk of Water Loss posed by the unreasonably and/or inherently dangerous, defective, and/or hazardous Product;

g.      Failing to provide consumers with adequate instructions, precautions, and/or warnings for the safe use of the Product;

h.      Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product without concern for and/or adherence to all local, state, and federal laws, statutes, ordinances, rules, regulations, and/or codes;

i.      Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective,

and/or hazardous Product without concern for and/or adherence to all acceptable industry standards and codes;

j.      Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product when safer methods existed and/or were feasible;

k.      Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product that had a significant risk of stress corrosion cracking and/or dezincification under the environmental conditions in which such products were reasonably expected to be placed; and/or

l.      Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product that was comprised of component parts and/or materials which were insufficient to prevent stress corrosion cracking and/or dezincification under the environmental conditions in which such products were reasonably expected to be placed.

149.    As a direct, proximate, and foreseeable result of the unreasonably and/or inherently dangerous, defective, and/or hazardous condition of the Product as aforesaid, and its subsequent failure, the Water Loss occurred causing substantial damages to the Premises and its contents therein.

150.    As a direct, proximate, and foreseeable result of the unreasonably and/or inherently dangerous, defective, and/or hazardous condition of the Product as aforesaid, and its subsequent failure, Plaintiff's Insureds sustained substantial losses.

151.    As a direct, proximate, and foreseeable result of the unreasonably and/or inherently dangerous, defective, and/or hazardous condition of the Product as aforesaid, and its subsequent failure, and pursuant to the insurance policy issued by Plaintiff, Plaintiff made payments to, or on behalf of, its Insureds in an amount in excess of $296,696.90.

152.    By virtue of the payments made to, or on behalf of, its Insureds, and in accordance with the terms and conditions of the Policy, Plaintiff is now legally, equitably, and contractually subrogated to the rights of its Insureds as against Defendant Fanski Group, individually, jointly, and/or severally, to the extent of said payments.

**WHEREFORE**, Plaintiff hereby demands judgment in its favor and against Defendant Fanski Group, individually, jointly, and/or severally, in an amount in excess of $296,696.90, together with pre-judgment interest, post-judgment interest, and such other relief as this Honorable Court finds proper and just under the circumstances.

## COUNT XIV – STRICT LIABILITY
### (Plaintiff v. Defendant Fanski Group)

153.    Plaintiff hereby incorporates the previous paragraphs of this Complaint as if fully set forth herein at length.

154.    The Product was designed, engineered, developed, manufactured, assembled, tested, inspected, packaged, labeled, promoted, marketed, distributed, supplied, sold, and/or placed into the stream of commerce by Defendant Fanski Group in the ordinary course of business.

155. At the time that the Product was placed into the stream of commerce by Defendant Fanski Group, Defendant Fanski Group knew and intended that such products would be used by members of the general public and knew of the specific uses, purposes and requirements for which said products would be utilized.

156. The Product malfunctioned and/or failed to operate in the manner which such a product should under the circumstances.

157. At the time that the Product was placed into the stream of commerce by Defendant Fanski Group, it was in an unreasonably and/or inherently dangerous, defective, and/or hazardous condition.

158. Defendant Fanski Group knew, or should have known, that the Product was unreasonably and/or inherently dangerous, defective, and/or hazardous when used for its normal, intended use.

159. As a direct, proximate, and foreseeable result of the unreasonably and/or inherently dangerous, defective, and/or hazardous condition of the Product as aforesaid, and its subsequent failure, the Water Loss occurred causing substantial damages to the Premises and its contents therein.

160. As a direct, proximate, and foreseeable result of the unreasonably and/or inherently dangerous, defective, and/or hazardous condition of the Product as aforesaid, and its subsequent failure, Plaintiff's Insureds sustained substantial losses.

161. As a direct, proximate, and foreseeable result of the unreasonably and/or inherently dangerous, defective, and/or hazardous condition of the Product as aforesaid, and its subsequent

failure, and pursuant to the insurance policy issued by Plaintiff, Plaintiff made payments to, or on behalf of, its Insureds in an amount in excess of $296,696.90.

162.    By virtue of the payments made to, or on behalf of, its Insureds, and in accordance with the terms and conditions of the Policy, Plaintiff is now legally, equitably, and contractually subrogated to the rights of its Insureds as against Defendant Fanski Group, individually, jointly, and/or severally, to the extent of said payments.

**WHEREFORE**, Plaintiff hereby demands judgment in its favor and against Defendant Fanski Group, individually, jointly, and/or severally, in an amount in excess of $296,696.90, together with pre-judgment interest, post-judgment interest, and such other relief as this Honorable Court finds proper and just under the circumstances.

## COUNT XV – BREACH OF IMPLIED WARRANTY
### (Plaintiff v. Defendant Fanski Group)

163.    Plaintiff hereby incorporates the previous paragraphs of this Complaint as if fully set forth herein at length.

164.    In designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce the Product, Defendant Fanski Group impliedly warranted that the Product was of good and merchantable quality and/or fit for its ordinary, intended, and/or foreseeable use and/or purpose.

165.    Defendant Fanski Group, through the acts and omissions of its agents, servants, workmen, contractors and/or employees, breached the aforesaid implied warranties both generally and specifically as follows by:

a.      Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product;

b.      Failing to adequately, properly, and/or safely design, engineer, develop, manufacture, assemble, test, inspect, package, label, promote, market, distribute, supply, sell, and/or place into the stream of commerce the Product;

c.      Selling, distributing, supplying, and/or placing into the stream of commerce the Product in an unreasonably and/or inherently dangerous, defective, and/or hazardous condition;

d.      Selling, distributing, supplying, and/or placing into the stream of commerce the Product which malfunctioned and caused the Water Loss;

e.      Selling, distributing, supplying, and/or placing into the stream of commerce the Product which malfunctioned and/or failed to operate in the manner which such Product should under the circumstances;

f.      Failing to warn consumers of the substantial risk of Water Loss posed by the unreasonably and/or inherently dangerous, defective, and/or hazardous Product;

g.      Failing to provide consumers with adequate instructions, precautions, and/or warnings for the safe use of the Product;

h.      Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective,

and/or hazardous Product without concern for and/or adherence to all local, state, and federal laws, statutes, ordinances, rules, regulations, and/or codes;

i.      Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product without concern for and/or adherence to all acceptable industry standards and codes;

j.      Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product when safer methods existed and/or were feasible;

k.      Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product that had a significant risk of stress corrosion cracking and/or dezincification under the environmental conditions in which such products were reasonably expected to be placed;

l.      Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product that was comprised of component parts and/or materials which were insufficient to prevent stress corrosion cracking and/or dezincification under the environmental conditions in which such products were reasonably expected to be placed;

       m.      Otherwise selling, distributing, supplying, and/or placing into the stream of commerce a Product which was not of good and merchantable quality; and/or

       n.      Otherwise selling, distributing, supplying, and/or placing into the stream of commerce a Product which was not fit for its ordinary, intended, and/or foreseeable use and/or purpose.

166.    As a direct, proximate, and foreseeable result of the breaches of Defendant Fanski Group as aforesaid, the Water Loss occurred causing substantial damages to the Premises and its contents therein.

167.    As a direct, proximate, and foreseeable result of the breaches of Defendant Fanski Group as aforesaid, Plaintiff's Insureds sustained substantial losses.

168.    As a direct, proximate, and foreseeable result of the breaches of Defendant Fanski Group as aforesaid, and pursuant to the insurance policy issued by Plaintiff, Plaintiff made payments to, or on behalf of, its Insureds in an amount in excess of $296,696.90.

169.    By virtue of the payments made to, or on behalf of, its Insureds, and in accordance with the terms and conditions of the Policy, Plaintiff is now legally, equitably, and contractually subrogated to the rights of its Insureds as against Defendant Fanski Group, individually, jointly, and/or severally, to the extent of said payments.

**WHEREFORE**, Plaintiff hereby demands judgment in its favor and against Defendant Fanski Group, individually, jointly, and/or severally, in an amount in excess of $296,696.90, together with pre-judgment interest, post-judgment interest, and such other relief as this Honorable Court finds proper and just under the circumstances.

## COUNT XVI – NEGLIGENCE
### (Plaintiff v. Defendant Fanski USA)

170.    Plaintiff hereby incorporates the previous paragraphs of this Complaint as if fully set forth herein at length.

171.    The Product was designed, engineered, developed, manufactured, assembled, tested, inspected, packaged, labeled, promoted, marketed, distributed, supplied, sold, and/or placed into the stream of commerce by Defendant Fanski USA in the ordinary course of business.

172.    At the time that the Product was placed into the stream of commerce by Defendant Fanski USA, it owed a duty to the public, including Plaintiff's Insureds, to ensure that said Product was free of any dangerous, defective, and/or hazardous conditions that could cause reasonably foreseeable harm such as a water discharge.

173.    At all times material hereto, the Product was used in a reasonably anticipated and foreseeable manner.

174.    Defendant Fanski USA, through the acts and omissions of its agents, servants, workmen, contractors and/or employees, breached its duties of care both generally and specifically as follows by:

        a.      Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product;

        b.      Failing to adequately, properly, and/or safely design, engineer, develop, manufacture, assemble, test, inspect, package, label, promote, market, distribute, supply, sell, and/or place into the stream of commerce the Product;

       c.      Selling, distributing, supplying, and/or placing into the stream of commerce the Product in an unreasonably and/or inherently dangerous, defective, and/or hazardous condition;

       d.      Selling, distributing, supplying, and/or placing into the stream of commerce the Product which malfunctioned and caused the Water Loss;

       e.      Selling, distributing, supplying, and/or placing into the stream of commerce the Product which malfunctioned and/or failed to operate in the manner which such Product should under the circumstances;

       f.      Failing to warn consumers of the substantial risk of Water Loss posed by the unreasonably and/or inherently dangerous, defective, and/or hazardous Product;

       g.      Failing to provide consumers with adequate instructions, precautions, and/or warnings for the safe use of the Product;

       h.      Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product without concern for and/or adherence to all local, state, and federal laws, statutes, ordinances, rules, regulations, and/or codes;

       i.      Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product without concern for and/or adherence to all acceptable industry standards and codes;

        j.       Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product when safer methods existed and/or were feasible;

        k.      Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product that had a significant risk of stress corrosion cracking and/or dezincification under the environmental conditions in which such products were reasonably expected to be placed; and/or

        l.       Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product that was comprised of component parts and/or materials which were insufficient to prevent stress corrosion cracking and/or dezincification under the environmental conditions in which such products were reasonably expected to be placed.

175.    As a direct, proximate, and foreseeable result of the unreasonably and/or inherently dangerous, defective, and/or hazardous condition of the Product as aforesaid, and its subsequent failure, the Water Loss occurred causing substantial damages to the Premises and its contents therein.

176.    As a direct, proximate, and foreseeable result of the unreasonably and/or inherently dangerous, defective, and/or hazardous condition of the Product as aforesaid, and its subsequent failure, Plaintiff's Insureds sustained substantial losses.

177.    As a direct, proximate, and foreseeable result of the unreasonably and/or inherently dangerous, defective, and/or hazardous condition of the Product as aforesaid, and its subsequent failure, and pursuant to the insurance policy issued by Plaintiff, Plaintiff made payments to, or on behalf of, its Insureds in an amount in excess of $296,696.90.

178.    By virtue of the payments made to, or on behalf of, its Insureds, and in accordance with the terms and conditions of the Policy, Plaintiff is now legally, equitably, and contractually subrogated to the rights of its Insureds as against Defendant Fanski USA, individually, jointly, and/or severally, to the extent of said payments.

**WHEREFORE**, Plaintiff hereby demands judgment in its favor and against Defendant Fanski USA, individually, jointly, and/or severally, in an amount in excess of $296,696.90, together with pre-judgment interest, post-judgment interest, and such other relief as this Honorable Court finds proper and just under the circumstances.

## COUNT XVII – STRICT LIABILITY
### (Plaintiff v. Defendant Fanski USA)

179.    Plaintiff hereby incorporates the previous paragraphs of this Complaint as if fully set forth herein at length.

180.    The Product was designed, engineered, developed, manufactured, assembled, tested, inspected, packaged, labeled, promoted, marketed, distributed, supplied, sold, and/or placed into the stream of commerce by Defendant Fanski USA in the ordinary course of business.

181.    At the time that the Product was placed into the stream of commerce by Defendant Fanski USA, Defendant Fanski USA knew and intended that such products would be used by members of the general public and knew of the specific uses, purposes and requirements for which said products would be utilized.

182.    The Product malfunctioned and/or failed to operate in the manner which such a product should under the circumstances.

183.    At the time that the Product was placed into the stream of commerce by Defendant Fanski USA, it was in an unreasonably and/or inherently dangerous, defective, and/or hazardous condition.

184.    Defendant Fanski USA knew, or should have known, that the Product was unreasonably and/or inherently dangerous, defective, and/or hazardous when used for its normal, intended use.

185.    As a direct, proximate, and foreseeable result of the unreasonably and/or inherently dangerous, defective, and/or hazardous condition of the Product as aforesaid, and its subsequent failure, the Water Loss occurred causing substantial damages to the Premises and its contents therein.

186.    As a direct, proximate, and foreseeable result of the unreasonably and/or inherently dangerous, defective, and/or hazardous condition of the Product as aforesaid, and its subsequent failure, Plaintiff's Insureds sustained substantial losses.

187.    As a direct, proximate, and foreseeable result of the unreasonably and/or inherently dangerous, defective, and/or hazardous condition of the Product as aforesaid, and its subsequent failure, and pursuant to the insurance policy issued by Plaintiff, Plaintiff made payments to, or on behalf of, its Insureds in an amount in excess of $296,696.90.

188.    By virtue of the payments made to, or on behalf of, its Insureds, and in accordance with the terms and conditions of the Policy, Plaintiff is now legally, equitably, and contractually

subrogated to the rights of its Insureds as against Defendant Fanski USA, individually, jointly, and/or severally, to the extent of said payments.

**WHEREFORE**, Plaintiff hereby demands judgment in its favor and against Defendant Fanski USA, individually, jointly, and/or severally, in an amount in excess of $296,696.90, together with pre-judgment interest, post-judgment interest, and such other relief as this Honorable Court finds proper and just under the circumstances.

<u>**COUNT XVIII – BREACH OF IMPLIED WARRANTY**</u>
**(Plaintiff v. Defendant Fanski USA)**

189.    Plaintiff hereby incorporates the previous paragraphs of this Complaint as if fully set forth herein at length.

190.    In designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce the Product, Defendant Fanski USA impliedly warranted that the Product was of good and merchantable quality and/or fit for its ordinary, intended, and/or foreseeable use and/or purpose.

191.    Defendant Fanski USA, through the acts and omissions of its agents, servants, workmen, contractors and/or employees, breached the aforesaid implied warranties both generally and specifically as follows by:

a.      Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product;

b. Failing to adequately, properly, and/or safely design, engineer, develop, manufacture, assemble, test, inspect, package, label, promote, market, distribute, supply, sell, and/or place into the stream of commerce the Product;

c. Selling, distributing, supplying, and/or placing into the stream of commerce the Product in an unreasonably and/or inherently dangerous, defective, and/or hazardous condition;

d. Selling, distributing, supplying, and/or placing into the stream of commerce the Product which malfunctioned and caused the Water Loss;

e. Selling, distributing, supplying, and/or placing into the stream of commerce the Product which malfunctioned and/or failed to operate in the manner which such Product should under the circumstances;

f. Failing to warn consumers of the substantial risk of Water Loss posed by the unreasonably and/or inherently dangerous, defective, and/or hazardous Product;

g. Failing to provide consumers with adequate instructions, precautions, and/or warnings for the safe use of the Product;

h. Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product without concern for and/or adherence to all local, state, and federal laws, statutes, ordinances, rules, regulations, and/or codes;

i. Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective,

and/or hazardous Product without concern for and/or adherence to all acceptable industry standards and codes;

j.      Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product when safer methods existed and/or were feasible;

k.      Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product that had a significant risk of stress corrosion cracking and/or dezincification under the environmental conditions in which such products were reasonably expected to be placed;

l.      Designing, engineering, developing, manufacturing, assembling, testing, inspecting, packaging, labeling, promoting, marketing, distributing, supplying, selling, and/or placing into the stream of commerce an unreasonably and/or inherently dangerous, defective, and/or hazardous Product that was comprised of component parts and/or materials which were insufficient to prevent stress corrosion cracking and/or dezincification under the environmental conditions in which such products were reasonably expected to be placed;

m.      Otherwise selling, distributing, supplying, and/or placing into the stream of commerce a Product which was not of good and merchantable quality; and/or

n.    Otherwise selling, distributing, supplying, and/or placing into the stream of commerce a Product which was not fit for its ordinary, intended, and/or foreseeable use and/or purpose.

192.    As a direct, proximate, and foreseeable result of the breaches of Defendant Fanski USA as aforesaid, the Water Loss occurred causing substantial damages to the Premises and its contents therein.

193.    As a direct, proximate, and foreseeable result of the breaches of Defendant Fanski USA as aforesaid, Plaintiff's Insureds sustained substantial losses.

194.    As a direct, proximate, and foreseeable result of the breaches of Defendant Fanski USA as aforesaid, and pursuant to the insurance policy issued by Plaintiff, Plaintiff made payments to, or on behalf of, its Insureds in an amount in excess of $296,696.90.

195.    By virtue of the payments made to, or on behalf of, its Insureds, and in accordance with the terms and conditions of the Policy, Plaintiff is now legally, equitably, and contractually subrogated to the rights of its Insureds as against Defendant Fanski USA, individually, jointly, and/or severally, to the extent of said payments.

**WHEREFORE**, Plaintiff hereby demands judgment in its favor and against Defendant Fanski USA, individually, jointly, and/or severally, in an amount in excess of $296,696.90, together with pre-judgment interest, post-judgment interest, and such other relief as this Honorable Court finds proper and just under the circumstances.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a jury trial.

Dated at Burlington, Vermont, this 23rd day of March, 2022.

Respectfully submitted,

The Burlington Law Practice, PLLC
Attorneys for Plaintiff,

Joshua L. Simonds, Esq.
2 Church St., Suite 2G
Burlington, VT 05401
(t) (802) 651-5370
jls@burlingtonlawpractice.com